## PEOPLE *ex rel.* TWEED v. LISCOMB.

*Habeas corpus — proceedings of Oyer and Terminer cannot be reviewed by. Statutory construction — 2 R. S. 563, § 22 — "competent court" — 1 R. S. 368, § 16, does not relieve supervisor from liability under 2 R. S. 696, § 38. Criminal law — cumulative sentences — duplicity in pleading — sentence to New York penitentiary. Jurisdiction — of misdemeanor committed in New York city under Laws 1855, chap. 337, § 5.*

An indictment against T. charged in different counts various misdemeanors of the same character. He was at the New York Oyer and Terminer convicted and received a separate sentence imposing fine and imprisonment upon each count — the terms of imprisonment succeeding each other. Having completed the term of imprisonment and paid the fine imposed by one sentence he sued out a *habeas corpus* for his release. *Held*, that upon the proceeding by *habeas corpus* the question whether the power of the Oyer and Terminer in rendering judgment had been exceeded could not be examined. The term "competent tribunal" in the statute relating to *habeas corpus* proceedings (2 R. S. 563, § 22) means a tribunal having jurisdiction of the subject-matter and of the person. The decisions of such a tribunal in a criminal proceeding properly before it cannot be reviewed upon *habeas corpus* upon the ground that it has in its action exceeded its jurisdiction. The only exception made by the statute is in favor of persons in custody by virtue of civil process.

*Held*, also, that the presentation of several charges in one indictment did not render the proceedings and conviction void.

*Held*, further, that the question of the competency of the jury at the trial, or the non-allowance to the prisoner of the legal number of peremptory challenges, could not be reviewed on proceedings by *habeas corpus*.

The provision of 1 R. S. 368, § 16, that if any supervisor shall refuse or neglect to perform any duties required of him by law he shall "forfeit the sum of $250;" *held*, not to relieve from liability under the provision of 2 R. S. 696, § 38, that "when any duty shall be enjoined by law upon any public officer, etc., every willful neglect to perform such duty, when no special provision shall have been made for the punishment of such delinquency, shall be a misdemeanor punishable," etc. The first-named provision does not provide for the *punishment* of the supervisor, but merely renders him liable to a civil action for a simple neglect, etc., while the latter provision requires the neglect to be willful.

The penitentiary of New York is by Laws 1814, chap. 176, made one of the jails of that city for the confinement of persons convicted of crime or misdemeanor by any court of Oyer and Terminer in said city. *Held*, that the sentence and commitment of one convicted of a misdemeanor in the court of Oyer and Terminer to the penitentiary was not error, and that the fact that the judgment record contained a statement that the prisoner should be imprisoned in the county jail did not affect the validity of the sentence and commitment.

The provision of Laws 1855, chap. 337, § 5, that "the court of special sessions of the peace in and for the county of New York shall have power to hear, determine and punish according to law all complaints for misdemeanors, and shall possess exclusive jurisdiction thereof," etc., *held* to apply only to misdemeanors prosecuted by complaint, and not to those prosecuted by indictment and a conviction by the Court of Oyer and Terminer in said county upon an indictment for a misdemeanor, *held* valid.

CERTIORARI to review the decision of the New York Oyer and Terminer in refusing to discharge the relator from imprisonment upon proceedings by *habeas corpus*.

The proceedings by *habeas corpus* were instituted upon the relation of William M. Tweed against Joseph L. Liscomb. The respondent was warden of the New York penitentiary on Blackwell's Island, the relator a prisoner confined therein. Sufficient facts appear in the opinion.

*David Dudley Field, George F. Comstock, William Fullerton, William O. Bartlett, Elihu Root, Willard Bartlett, Dudley Field* and *Edward R. Bacon,* for relator. There was a defect in the jurisdiction of the court. In such case the duty to discharge on *habeas corpus* is clear. *Ex parte Lange,* 18 Wall. 178; *Manyx* v. *Whitson,* Sup. Ct. of Illinois, Cent. Law Journal, Nov. 6, 1874; 2 R. S. 563, §§ 21, 22, 25; id. 567, §§ 39, 40, 41; *People* v. *McLeod,* 3 Hill, 665, note; *Endymoin's Case,* 8 How. 478; *Devine's Case,* 11 Abb. 90; *People* v. *Rawson,* 61 Barb. 619. The cumulative sentences were unwarranted by law and beyond the jurisdiction of the court. *Case of Stocking,* 50 Barb. 573; *Kane* v. *People,* 8 Wend. 203; *Guenther* v. *People,* 24 N. Y. 101. Also, cited *Reg.* v. *Cutbush,* 10 Cox's C. C. 489; *Carlton* v. *Commonwealth,* 5 Metc. 532. The jury was not competent. *People* v. *Dewick,* 2 Park. 232; Laws 1872, chap. 475; 1873, chap. 427. The court was not competent to try a misdemeanor under Laws 1855, chap. 337, § 5.

*Benjamin K. Phelps* and *Wheeler H. Peckham,* for respondent.

WESTBROOK, J. At a Court of Oyer and Terminer held in and for the city and county of New York on the 22d day of November, 1873, the relator, William M. Tweed, having been found guilty upon several different counts of a single indictment charging various misdemeanors, received separate sentence upon each. The aggregate term of imprisonment thereby inflicted in the peniten-

tiary of the city of New York was twelve years, and the total of the several fines imposed amounted to $12,500.

Having been confined in the penitentiary for a year and paid as a fine $250, the relator sued out a writ of *habeas corpus* directed to the warden of the penitentiary in which he was confined to inquire into the legality of the continued imprisonment.

The writ of *habeas corpus* was allowed on the 15th of December, 1874, by Mr. Justice LAWRENCE, and was returnable before the Court of Oyer and Terminer of the city and county of New York on the 17th day of the same month. On the last-mentioned day, in obedience to the writ, the respondent (the warden of the penitentiary) produced the body of Mr. Tweed, and by his return claimed to hold him under the judgment and sentence of the Court of Oyer and Terminer of the city and county of New York herein-before mentioned, rendered and pronounced on the 22d day of November, 1873.

The answer of the relator to the return of the respondent sub-stantially alleges, 1st. That the Court of Oyer and Terminer of the city and county had no jurisdiction or power to try the alleged mis-demeanors for the commission of which he was held; 2d. That the jury which rendered the verdict upon which the sentence was pro-nounced was not a lawful one; 3d. That the court had no power to punish more than a single misdemeanor, and that consequently all fines in excess of a single one of $250 and all imprisonment beyond a single year were illegal and void; and 4th. That the penalty for the offense charged in the indictment was a fine of $250 only.

The Court of Oyer and Terminer, before which the *habeas corpus* was heard, after a full hearing, discharged the writ and remanded the prisoner. The proceeding having been brought into this court by *certiorari*, the questions raised in the court below, and there deter-mined against the relator, are presented for review and deter-mination.

The relator, as has been previously mentioned, is detained by virtue of a final sentence and judgment of a Court of Oyer and Ter-miner, pronounced upon a verdict of a jury rendered upon a trial in that court of an indictment charging various misdemeanors. Upon the trial, that court held that it was proper and legal to unite several misdemeanors in one indictment, and to try and con-vict the accused upon each, and that, as several misdemeanors were,

in fact, joined and charged in the indictment, upon which a separate verdict was rendered, judgment could be, and was, pronounced against him for each crime of which he was found guilty.

As the attempt to have Mr. Tweed released was made by *habeas corpus*, this preliminary question meets us : What power had the court, or officer before which such writ was returnable, by virtue thereof, in the premises ?

The office of the writ, and the duties of the officer or court before which it is returnable, are, in this State, very clearly defined by statute, and the limitations upon the power conferred thereby are stated with great precision. A reference to some of the provisions of our *habeas corpus* act bearing upon the question before us, will show the difficulties which the relator has to encounter in presenting to the court the points upon which he claims he is entitled to be discharged.

First. By section twenty-two of that act (2 R. S. 563), among the persons who are therein declared to be not "entitled to prosecute such writ" are those who are "committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction."

Second. By section twenty-five (2 R. S. 564), "the petition must state, in substance," that the party applying for the writ "is not committed or detained by virtue of any process, judgment, decree or execution specified in the preceding twenty-second section."

Third. By section forty (2 R. S. 567), it is declared to be the duty of such court or officer before which the writ is returnable, "forthwith to remand such party, if it shall appear that he is detained in custody either" (enumerating several) "by virtue of the final judgment or decree of any competent court of civil or criminal jurisdiction, or of any execution issued upon such judgment or decree."

Fourth. By section forty-one (2 R. S. 568), when the party imprisoned is detained "by virtue of civil process from any court legally constituted or issued by any officer in the course of judicial proceedings before him, authorized by law," he may be discharged, provided (there are several grounds stated) "the jurisdiction of such court or officer has been exceeded, either as to matter, place, sums or person."

Fifth. By section forty-two (2 R. S. 568), it is declared :

" But no court or officer, on the return of any *habeas corpus* or *certiorari* issued under this article, shall have power to inquire into the *legality or justice* of any process, *judgment,* decree or execution specified in the preceding twenty-second section ; nor into the justice or propriety of any commitment for a contempt made by any court, officer or body, according to law, and charged in said com- mitment as hereinbefore provided. "

It is claimed on the part of the relator, that the expression con- tained in the twenty-second section, " any *competent* tribunal " justi- fies the presentation of all the questions now submitted. It is argued that whenever the " final judgment or decree " was not such an one as the tribunal, in the opinion of the court or officer grant- ing the writ, pronouncing or rendering it was " competent " to pronounce or render, then the person detained in custody should be discharged.

In giving to the statute this construction, the consequence can- not be overlooked. The twenty-third section (2 R. S. 563) of the *habeas corpus* act confers the power to issue the writ, not only upon the Supreme Court or any of its judges, but also upon " any officer who may be authorized to perform the duties of a justice of the Supreme Court at chambers, being or residing within the county where such prisoner is detained." Will it be argued that our law makers intended that the judgment of the courts of Oyer and Terminer, which constitute the highest grade of courts pos- sessing original criminal jurisdiction, should be summarily reviewed and practically reversed by any officer who, whilst he is in the judi- cial system of inferior rank to the judge who presides at such Oyer and Terminer, is yet empowered to issue this writ ? If this question be answered in the affirmative, such answer involves a want of symmetry in our judicial system which, as a rule, provides for appeals only from the inferior to the superior tribunal. Apart from the incongruity, which the practice of a local officer sending a prisoner back to the Oyer and Terminer for a re-sentence, would involve, another consequence, even more serious, would ensue. The officer allowing the writ has no such power, and in every case when, in his judgment, the power of the court had been exceeded, he would be compelled to open the prison door, and direct the criminal to go free and unpunished. Did our legislature intend this ? It certainly did, if the position of the relator is sound.

Again, if the construction given to the statutes by the relator

is sound, what necessity was there to make special provision, as has been done by section 41 (2 R. S. 568), allowing the court or officer granting the writ in all cases, where the prisoner is detained, "by virtue of *civil* process from any court legally constituted, or issued by any officer in the course of judicial proceedings before him," to discharge him, "when the jurisdiction of such court or officer has been exceeded either as to matter, place, sum or person." If, in every case where the court has exceeded its power in the extent of the judgment pronounced, such judgment could be reviewed upon *habeas corpus*, words have been wasted to confer just that power in "*civil*" cases only.

Lastly, if the words "competent tribunal" have the force attributed to them, what becomes of the forbidding incorporated in the forty-second section? By that, "no court or officer on the return of any *habeas corpus* or *certiorari*, issued under this article, shall have power to inquire into the *legality* or *justice* of any process, *judgment*, decree or execution specified in the preceding twenty-second section." And this twenty-second section is the identical one in which the words "competent tribunal" occur. Reading them together, as they must be to arrive at their intention, they read for the government of this case thus : "No court or officer on the return of any *habeas corpus* or *certiorari*, issued under this article, shall have power to inquire into the legality or justice of any process, judgment or decree of any competent tribunal of civil or criminal jurisdiction." The very question before us is the "*legality*" of the judgment of the Court of Oyer and Terminer of the city of New York. The want of power to determine this is, apparently at least, expressed in such simple, striking and far-reaching words that it becomes us to hesitate in the acceptance of a construction given to other words, not necessary to their meaning, which brings them in plain and direct collision.

The consequences, then, of the construction claimed by the counsel of the relator, placing the practical power of reversing the judgments of a superior court of original criminal jurisdiction in the hands of inferior judicial officers ; its making a whole section (that giving the power to decide whether, in the issue of "civil process," a court or officer has exceeded its jurisdiction) unnecessary ; and its direct collision with another, cause us to give to the words "competent tribunal" different meaning from that claimed by the relator.

Judicial construction should harmonize all the provisions of our statutes relating to a single subject. No interpretation of particular words or phrases can possibly be allowed, which renders other portions of the same act unnecessary and conflicts with other plain commands. In this case there is no difficulty in thus harmonizing them. If we construe these words, "competent tribunal," to mean a tribunal having jurisdiction of the subject-matter and of the person, the whole act is harmonious. Such a tribunal is a "competent" one — competent to try the question and party before it. The decisions of such a body, according to the whole theory of our laws, are to be reviewed by a superior one and not summarily disposed of by an inferior officer. If it errs in the extent of the judgment which it renders, the party injured is not remediless, but his alleged grievances must be deliberately examined upon appeal by a higher court, and not summarily passed upon by a local magistrate clothed with certain limited judicial power. It was, we submit, this plain and natural construction just given which induced the framers of the *habeas corpus* act to insert the clause giving the power when the detention was upon "civil process" to inquire into the excess of the jurisdiction assumed, and without which a party thus confined would also have been remediless.

The question we have discussed has not been considered so directly in this State, as the same is now presented, and yet in several cases the language employed indicates a concurrence in the view we have taken.

The case of *People v. Cassels*, 5 Hill, 164, involved the validity of a commitment of a witness for a contempt in refusing to answer a question upon an examination before a justice of the peace. A reference to the full text of the statutes, before cited in part, will show that commitments for contempts and upon final judgment are placed upon the same footing as to their capability of being reviewed upon *habeas corpus*. In that case (p. 167), BRONSON, J., says: "A contempt was specially and plainly charged in the commitment, and it was the duty of the judge, forthwith, to remand the prisoner (2 R. S. 567, § 40). The statute expressly forbids an inquiry into the justice or propriety of the commitment in such a case (§ 42). If there had been no such statute it is clear, upon principle, that the judgment or decision of any court or officer of competent jurisdiction cannot be reviewed on *habeas corpus*. If there has been error, the remedy is by *certiorari* or writ of error."

In *People* v. *Spalding*, 10 Paige, 284; S. C., 7 Hill, 301, a Supreme Court commissioner had, upon *habeas corpus*, discharged a person committed for a contempt in not paying a fine imposed by the Court of Chancery. It was held both by the chancellor and the Court of Errors (NELSON, C. J., delivering the opinion of the latter court), that the commissioner was utterly without jurisdiction in the premises, as the statutes prohibited him from inquiring "into the justice or propriety of the commitment."

In the very recent case of *People* v. *Fancher*, 4 N. Y. Sup. 467, the writer of this opinion had occasion to examine this same question, and nothing has transpired to shake his confidence in the soundness of the views therein expressed. Every consideration of public policy and of the express language of our statutes require us to hold that the judgment of a competent court — competent by reason of its having jurisdiction of the subject-matter and of the party — cannot be practically reversed and annulled by any officer empowered to grant the writ of *habeas corpus*. Plain words should not be refined away by legal subtlety, and when our written statute law emphatically declares that "no court or officer on the return of any *habeas corpus* or *certiorari* issued under this article shall have power to inquire into the *legality* or *justice* of any * * * judgment of any competent tribunal of civil or criminal jurisdiction," it is but our simple duty to obey its mandate and not permit a power to be assumed which our statutes declare the officer or tribunal granting the writ does not possess.

The application of the conclusion we have reached will now be made to the several points raised in behalf of the relator, which such conclusion affects, and they relate: First. To the several convictions and sentences upon a single indictment; Second. To the lawfulness of the jury; and, Third. To the legality of a sentence to imprisonment upon several of the counts in the indictment contained. Each of these will be examined in the order mentioned.

First. The alleged illegality of the several convictions and several sentences upon a single indictment. The jurisdiction of the court over the crimes and the accused being conceded, what does this point present more than the "legality" of the judgment which has been pronounced? That it does involve any thing more will scarcely be argued. And yet this is the very thing which the statute declares the court or officer upon the return to the writ is powerless to touch. The language of such forbidding is simple, direct and

sweeping. Our argument thus far has been useless, if we have failed to prove that the excessiveness of a *judgment* (which is all that even counsel claim this point involves) in a criminal case cannot be inquired into upon this proceeding. Ample power so to do is expressly conferred, when a party is detained upon *civil* process, but its exercise in a *criminal* one, where the court which pronounced the judgment had power to try the offense and render a judgment, is forbidden by an express declaration that the court or officer shall have no "power to inquire into the legality or justice" thereof. The mere repetition of the language of the act forecloses discussion.

But does this case really present a question of excess of jurisdiction? It is not denied that Mr. Tweed has been tried and convicted of several misdemeanors, and that several judgments have been pronounced thereon. Nor is it pretended that the aggregate of the several punishments is in excess of what the court was authorized to inflict. The point then necessarily is that the joinder of the several offenses in a single indictment — their investigation upon a single trial — and the separate convictions and judgments thereon were illegal. This proposition admits the jurisdiction, but questions the manner of its exercise. While the power to do the several acts is conceded, the mode of doing them is denied. The proper step to acquire jurisdiction having been taken by the presentation of an indictment, and the judgment upon the crimes and the offender being no greater than the law allowed, what are the intervening steps but simply questions of practice, which, while they may be pronounced erroneous in a proper proceeding to review them, cannot and do not render the judgments void?

The prosecution of Mr. Tweed was begun by an indictment found by a grand jury. It accused the relator of sundry misdemeanors, and presented them by separate counts in a single accusation. Assuming that this was a misjoinder of offenses, did the court thereby lose its jurisdiction of the crimes and the party charged therewith? Suppose in a civil action the defendant is brought before the court by proper process, and when the court has thus acquired jurisdiction, he is required to answer a complaint which improperly unites various causes of action, and after issues thus joined the cause proceeds to trial and judgment, is such judgment void, provided it was not in excess of the power of the court over all the causes of action separately? This will hardly be pretended,

and yet it is the identical question presented. The court before which Mr. Tweed was tried was a competent one for that purpose, there was no lack of jurisdiction in regard to the person or the accusations, but because the power was exerted by compelling him to defend himself against all the charges upon a single trial by the joinder of the offenses in a single complaint, called an indictment, it is urged that the whole proceeding is void.

The soundness of this proposition can only be established by showing that the grouping of offenses in a single indictment is so illegal as to make null the preliminary proceeding, thus rendering all subsequent steps thereunder void. To do this it must be demonstrated that every indictment, in order to give the court jurisdiction over the offender and the offenses, must accuse of a single, and only a single crime ; and when this is proved, and not before, will it follow that in case this practice is departed from the court acquires no power to proceed, and its action is a legal nothing. When this has been done, the illegality of the major part of our criminal convictions has been exhibited, and the illegal and unauthorized imprisonment and judicial murder of many individuals has been conclusively shown. This is no over-statement, for the practice of all courts from time immemorial has been to unite offenses, *in words* at least, if not so actually. Scarcely an indictment is drawn or presented which does not contain several counts, each one of which, in theory at least, presents a different accusation. Several offenses being *thus* charged all convictions thereunder are illegal and void if the arguments of the relator are sound.

The reasoning which starts with the assumption that a court obtains no jurisdiction over several offenses, and the offender, when they are charged in a single indictment, certainly overlooks all precedents and practice. The right to frame an indictment with different counts to meet the proof is based upon a directly opposite theory. Every indictment which contains more than a single count assumes to charge a separate and different offense in each. A demurrer, or a motion in arrest of judgment, in every such case, would necessarily prevail, if different offenses could not be joined, for upon the face of the bill there are several offenses charged. There is no necessity, however, for abstract reasoning to show that the joinder of offenses, in a single presentation, does not deprive the court of jurisdiction. The authorities are numerous to show

that this practice, so far from rendering the whole proceeding void, is not even irregular; but, on the contrary, it is the well-settled course of procedure of criminal courts.

Burns' Justice (vol. 2, page 502) thus states the rule : "If there be *one offender, and several offenses* committed by him, as burglary and larceny, they may be contained in one indictment."

Hawkins, in his "Pleas of the Crown," in the chapter which treats of indictments, in stating the requisites thereof (vol. 2, page 322), says : "Fifthly. That regularly every indictment must either charge a man with some particular offense, or else with *several* of such offenses, particularly and certainly expressed, and not with being an offender in general."

Hale's Pleas of the Crown (vol. 2, page 173) thus states the law as to the joinder of offenses : "If there be one offender and several capital offenses committed by him, they may be all contained in one indictment, as burglary and larceny. Larcenies committed of several things, though at several times and from several persons, may be joined in one indictment."

In East's Pleas of the Crown (vol. 2, page 515) the same rule is recognized, and the *Case of Thompson* is cited. In that case, "upon a general verdict of guilty, it was objected that there were two several capital charges in the same indictment, which it was said tended to deprive the prisoner of so many challenges as he would be entitled to if the indictment were distinct, namely, twenty upon each. Another objection was, that it would tend to perplex the prisoner in his defense, but seven judges (being all who were present at the conference) held the indictment good."

Chitty's Criminal Law (vol. 1, pages 252, 253, 254) says : "In cases of *felony,* no more than one distinct offense or criminal accusation at one time should regularly be charged upon the prisoner in one indictment, because, if that should be shown to the court before filed, they will quash the indictment, lest it should confound the prisoner in his defense, or prejudice him in his challenge to the jury; for he might object to a juryman trying one of the charges, though he might have no reason so to do in the other; and if they do not discover it until afterward, they may compel the prosecutor to elect on which charge he will proceed. But this is only matter of prudence and discretion, which it rests with the judges to exercise. For in point of law, there is no objection to the insertion of several distinct felonies of the same degree, though

committed at different times, in the same indictment, against the same offender; and it is no ground of either demurrer or arrest of judgment. * * * In the cases of *misdemeanors*, the joinder of several offenses will not, in general, vitiate in any stage of the prosecution. For in offenses inferior to felony, the practice of quashing the indictment, or calling upon the prosecution to elect which charge he will proceed on, does not exist. But, on the contrary, it is the constant practice to secure evidence of several libels and assaults upon the same indictment. It was indeed formerly held that assaults on more than one individual could not be joined in the same proceeding ; but this is now exploded, for, though two persons cannot join in a civil action, the reason is that the damages are several, which cannot apply to criminal proceedings where no compensation is given to the prosecutor, and public security is the object to be attained." And again, the same work (vol. 1, p. 718), declares: "So, when he is charged with several offenses at the same time, of the same kind, he may be sentenced to several terms of imprisonment, one after the conclusion of the other."

Archbold's Criminal Pleadings (Waterman's Edition of 1853, vol. 1, p. 95) contains the same doctrine: "If different felonies or misdemeanors be stated in several counts of an indictment, no objection can be made to the indictment on that account in point of law. In cases of *felony*, indeed, the judge, in his discretion, may require the counsel for the prosecution to select one of the felonies, and confine himself to that. This is what is technically termed 'putting the prosecutor to his election.' But this practice has never been extended to *misdemeanors*."

It cannot be necessary to refer in detail to the numerous cases decided in England sustaining the rule, as laid down by the eminent and standard authors to whom we have referred. A reference to the works we have cited will show that those cases are very numerous ; but the universally acknowledged authority of the writers quoted renders that labor unnecessary. We content ourselves with the citation of a single very recent and famous one, known as that of "the Tichborne claimant."

The trial was before the Court of Queen's Bench, and the judges composing the court were the Lord Chief Justice of England, the Hon. Justice MELLOR, and the Hon. Justice LUSH. The indictment upon which the proceedings were founded was filed Easter term, 1872, against Thomas Castro *alias* Orton *alias* Tichborne.

The first count of indictment charged defendant with perjury committed in evidence given by him in the recent trial of *Tichborne* v. *Lushington*. The second count charged defendant with perjury in an affidavit sworn by him in the Chancery suit of *Tichborne* v. *Tichborne*. Defendant pleaded "not guilty." (See "Tichborne trial, the summing up by the Lord Chief Justice, Unabridged Ed., London, Ward, Lock and Tyler.") The jury (see p. 285) found a separate verdict of guilty on each count, and a general verdict of guilty on both counts. The sentence and judgment of the court were pronounced by Mr. Justice MELLOR (pp. 286, 287), and was couched in the following language. " The sentence of the court, which I now pronounce, is, that for the perjury alleged in the *first count* of this indictment, upon which you have been convicted, you be kept in penal servitude for the term of seven years ; and that for the perjury alleged in the *second count* of this indictment of which you have also been convicted, you be kept in penal servitude for the further term of seven years, to commence immediately upon the expiration of the term of penal servitude assigned to you, in respect of your conviction, upon the first count of this indictment, and that is the sentence of the court."

It may not be improper to add, that so well settled does the law of England seem to be in that regard, that no question was made as to the regularity of the sentence, and not a single objection interposed or exception taken thereto, and it will be further observed that the indictment upon which the prisoner was convicted was of two separate and distinct offenses — the one of perjury in giving evidence " on a trial, and the other of perjury in making an affidavit in a separate and distinct action."· It furnishes, therefore, an answer to the position of the counsel for the relator, that there was no case upholding the joinder of disconnected offenses, and the awarding of cumulative sentences thereon. The law of Massachusetts, Connecticut and Pennsylvania is in accordance with that of England, as the following cases will show.

In *Carlton* v. *Commonwealth*, 5 Metc. 532, the Supreme Court of Massachusetts decided, "two or more *distinct* offenses may be included in *one* indictment in several counts, when the offenses are of the same general nature, and where the mode of trial and the nature of the punishment are also the same. When a defendant is found guilty generally, on an indictment which charged him with several *distinct* offenses, it is not necessary that separate sen-

tences should be awarded. A single sentence is legal if it do not exceed the sum of the *several* sentences which might be awarded."

This case was followed in *Booth* v. *Commonwealth,* 5 Metc. 585, in *Josslyn* v. *Commonwealth,* 6 id. 236 ; in *Crowley* v. *Commonwealth,* 11 id. 575 ; in *Kite* v. *Commonwealth,* id. 581 ; in *Commonwealth* v. *Hills,* 10 Cush. 530, and in *Commonwealth* v. *Carey,* 103 Mass. 214.

The same rule prevails in Connecticut. It was held in *State* v. *Tuller,* 34 Conn. 281, " It is essential to the administration of justice that several distinct offenses should be joined in cases of misdemeanors, and in some cases of felony, that the same offense should be laid differently in different counts, and the rule precludes the right of the prisoner to insist upon an election of counts, or that the jury should be required to find specially on each count. Where there are several counts in the information, and a general verdict is rendered, the jury will be presumed to have found the prisoner guilty upon all the counts, and the court will impose a sentence in accordance with the facts proven upon the trial."

In the very recent case (January 9, 1872) of *Commonwealth* v. *Birdsall,* 69 Penn. St. 482, the Supreme Court of Pennsylvania have examined the question and re-affirmed its correctness.

Many other of the States have adopted the same rule. The ordinary limits of an opinion do not permit us to cite in detail the numerous cases decided in this country. Very many of them are referred to in the United States Digest of Criminal Law, pages 335, 336, and the American notes to Hale, Chitty and Archbold, before referred to. With a single citation, therefore, from a standard American Treatise upon Criminal Law (Wharton's), we will then refer to some of the New York cases. In discussing that question, that author ( 7th ed., vol. 3, § 3397 ) says, " The law imposes certain penalties for assault and battery, which penalties are designed to cover the assault as well as the battery. To sentence the defendant for the penalties for an assault as averred in the first count, and then, again, for an assault and battery as averred in the second count, would expose him to a double punishment for the same offense. The only legitimate course, when the several counts are simply successive stages of one offense, is in accordance with the view already given, to impose sentence on the count containing the highest offense, dropping the rest. This, to repeat once more the distinction so important to keep in mind, in cases of this

class, is on the supposition that the several counts are simply for separate stages, or modifications of the same offense. Here it stands to reason there can be no cumulative punishment. Yet it equally stands to reason that where two *distinct* offenses are coupled in the same indictment and there is a general verdict, then a cumulative punishment can be imposed, or according to the Pennsylvania practice, which is more exact, a distinct punishment on each count."

Much stress was, however, made upon the argument, by the counsel of the relator, that whatever might be the common law of England and other States upon this question, the common law of New York was different, and did not allow the practice adopted in this case. It is scarcely necessary, perhaps, in answer to the objection which assumes the wide difference between the common law of England and of New York to cite section 17 of article 1 of our constitution. Whatever result in answer to the assumed antagonism of the two could be evolved by reasoning thereon is rendered unnecessary by express adjudication of our highest courts.

*Kane* v. *People*, 8 Wend. 203, was a case in our Court of Errors, then our highest appellate tribunal. The plaintiff in error in that case was convicted upon an indictment containing two counts, and averring in words at least two distinct offenses. His counsel (the late Judge PAIGE) made as his fourth point (page 207), the one we are now discussing, in these words : "There is a misjoinder of offenses in the indictment; there being *two* counts against the defendants below, as directors *of different* companies." The chancellor, whose opinion was unanimously concurred in, in answer to this position (pages 210, 211), says : "The fourth objection is for a misjoinder of counts in the indictment. If there ever was any thing in this objection it should have been addressed to the *discretion* of the court before conviction. In cases of *felony,* when two or more distinct and separate offenses are contained in the same indictment, the court, in its discretion, may quash the indictment or compel the prosecutor to elect upon which charge he will proceed, but in point of law it is no objection that two or more offenses of the same nature and upon which the same or a similar judgment may be given are contained in different counts of the same indictment. It, therefore, forms no ground of a motion in arrest of judgment ; neither can it be objected to by way of demurrer, or on a writ of error. *Rex* v. *Young,* 2 Peake's N. P. 228. It is an every day

People ex rel. Tweed v. Liscomb.

practice to charge a felony in different ways in several counts, for the purpose of meeting the evidence, as it may come out upon the trial. Each of the counts on the face of the indictment purports to be for a distinct and separate offense, and the jury very frequently find a general verdict on all the counts, although only one offense is proved, but no one ever supposed that formed a ground for arresting the judgment. If the different counts are inserted in good faith for the purpose of meeting a single charge, the court will not even compel the prosecutor to elect, and in the case of mere *misdemeanors*, which are only punishable by fine or imprisonment, the prosecutor is permitted to *join* and *try* several *distinct* offenses in the *same* indictment."

In *People* v. *Costello*, 1 Denio, 83, in pronouncing the judgment of the Supreme Court, Judge BEARDSLEY (pages 89, 90) says : " Distinct offenses were charged, in the different counts of this indictment, and the evidence went to show that two crimes had been committed. 1. That an instrument had been used at one time for the purpose charged. 2. That on other occasions, and at other times, drugs had been resorted to for the same purpose. The offenses charged were misdemeanors, and it is well-settled law that several misdemeanors may be joined in the same indictment and a conviction for all may take place at the same trial. The prosecutor is not bound in such cases to elect a single offense from amongst the number charged, and proceed for that alone, but may ask a conviction for as many offenses as are proven. Roscoe's Cr. Ev.216; *Rex* v. *Jones*, 2 Campb. 132; *Kane* v. *People*, 8 Wend. 211 ; 1 Chit. Cr. Law, 249, 254 ; *Rex* v. *Levy*, 2 Stark. 405 ; *Commonwealth* v. *Gillespie*, 7 Serg. & Rawle, 476."

With these two cases from our own reports, which no subsequent one that we have seen questions, we cannot possibly hold that the presentation of the several charges against the relator in one indictment was so irregular and informal as to render the whole proceedings void, and the conviction a nullity.

They settle the common law and practice of New York to be in accordance with that of England. Possibly a case in New Hampshire or Indiana or Kentucky may enunciate a different doctrine, but the law of New York is in harmony with that of England, Massachusetts, Connecticut, Pennsylvania and other States. The case of *State* v. *Lincoln*, 49 N. H. 464, certainly does not decide that the court loses jurisdiction when several offenses are charged in one indict-

ment, but simply holds that in such a case " the judge may at any stage of the proceedings put the prosecutor to his election or quash the indictment." Neither is the case of *James* v. *Ward*, 2 Metc. (Ky.) 271, in point to sustain the position of the relator's counsel, because, as will be seen by reference to it, the opinion is based upon a provision of the Kentucky statutes which requires the jury to fix the punishment. If, however, these cases were directly applicable, in view of the contrary practice, which has been firmly settled in England for ages, adopted in many other of our States and sustained by two direct decisions in this, we should hold that an immense preponderance of authority existed in favor of the course pursued in this case, and that certainly upon this proceeding, at least (that of *habeas corpus*), which only presents jurisdictional questions, the relator is without remedy for the reason which we have considered. Whether or not a writ of error or any proceeding may be taken to review the discretion exercised by the judge upon the trial is not decided. That question is not before us, and upon it no opinion is expressed.

Second. But it is also claimed that the defendant was tried by an incompetent jury. It is argued that because chapter 475 of the Laws of 1872 provided that a previous formation or expression of an opinion or impression in reference to the circumstances upon which any criminal action at law is based, etc., shall not disqualify a person summoned as a juror, provided "he shall declare on oath that he verily believes that he can render an impartial verdict according to the evidence submitted to the jury on such trial, and that such previously formed opinion or impression will not bias or influence his verdict, and provided the court shall be satisfied that the person so proposed as a juror does not entertain such a present opinion as would influence his verdict as a juror," and also because chapter 427 of the Laws of 1873 provided for the trial of all challenges by the court, that the jury chosen in conformity with these laws was illegal and their verdict void.

We do not see how it is possible to present this question upon *habeas corpus*. It enters so largely into the merits of the trial that its review upon this proceeding is impossible. If there is any virtue in the point, then, when any erroneous decision is made as to the selection of a juror, or whenever any officer authorized to grant the writ *thinks* such an error has been committed, he can open the

prison doors and let the criminal free. Such a proposition shocks the moral sense, and its statement is its sure condemnation.

The point, however, as to the legality of the jury is without force. The mode and manner of the selection of a jury is under legislative control, and a change of law in that respect is not obnoxious to any constitutional objection. *Walter* v. *People*, 32 N. Y. 147.

It is also claimed that the judge holding the Oyer and Terminer before which Mr. Tweed was committed, did not allow him the number of peremptory challenges to which he was entitled ; that he should have had five for each " *offense* " charged. How is it possible to present this question now ? If it can be argued that errors were made in the selection of jurors, and, therefore, there was no jury, so, too, it can then be argued that the evidence admitted by the court was illegal, and, therefore, the prisoner was convicted upon none. Having reached this conclusion, counsel for a prisoner have only to satisfy some officer empowered to grant this writ, that such an error has been committed, and the proceedings of grave trials before our highest courts are reviewed by local officers, and judgments reversed at their pleasure. Will learned counsel gravely argue in favor of such a proposition ?

Third. It is further argued that it was not competent for the court to sentence the defendant to *imprisonment* upon the first, second and third counts in each set of counts ; the only penalty to which he could have been subjected was a penalty of $250.

The reason given to sustain the point is, that Mr. Tweed was not liable to conviction and punishment for misdemeanors under 2 R. S. 696, § 38, because a special provision has been made for the punishment of the delinquency charged. This reason is founded, as claimed, upon 2 R. S. 696, § 38 ; and 1 R. S. 368, § 16. The former reads thus : " When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every *willful* neglect to perform such duty, when no special provision shall have been made for the punishment of such delinquency, shall be a misdemeanor, punishable as herein prescribed." The latter is as follows : " If any supervisor shall refuse or neglect to perform any of the duties which are, or shall be, required of him by law as a member of the board of supervisors, he shall, for every such offense, forfeit the sum of $250."

To this point there are several answers.

First. A court of competent jurisdiction has decided otherwise,

and its "final judgment" cannot be reviewed upon this proceeding.

Second. The fines which it concedes could be imposed are not paid, and the detention for such non-payment would be proper.

Third. The point assumes a fact which is not correct. No special provision by 1 R. S. 368, § 16, is made for the punishment by *criminal prosecution* of any " supervisor who shall refuse or neglect to perform his duties " or any of them. That section prescribes a penalty to be recovered in a *civil action* for a *simple* refusal or neglect to perform a duty. *Caswell* v. *Allen,* 7 Johns. 63 ; *Morris* v. *People,* 3 Denio, 381. The provision in 2 R. S. 696, § 38, makes the *" willful"* neglect of "any public officer" a crime — a misdemeanor. The punishment of that *crime* is not provided for by the *civil* action to recover the penalty given by the previous statute for a *simple* refusal — a neglect of duty. The omission to perform the duty which makes the act criminal must be *willful,* whilst that element, willfulness, is absent from the enactment which creates the penalty. To make the point effectual, the relator must show that some *"punishment"* for the misdemeanors of which he is convicted, other than those inflicted, is *"prescribed."* The section before quoted, certainly does not profess to do this, and is entirely inapplicable.

We have now examined the questions which the proceeding involves, affecting and concerning the legality of the convictions and the judgments pronounced. We are clearly of opinion that no error has been committed in either of these respects which could have justified the discharge of Mr. Tweed, upon the return to the writ issued to inquire into the legality of his detention. The remaining two questions — that of the place of imprisonment, and the jurisdiction of the Court of Oyer and Terminer in the city of New York over misdemeanors, have been fully examined by Mr. Justice DANIELS, and in his results and reasoning I fully concur.

In the decision which we are to give, we are to answer simply legal questions. No discretion to abate or lengthen punishment is confided to us. Nor is there any opportunity, upon this proceeding, to review any alleged errors upon the trial, or the improper exercise of discretion by the court before which the conviction took place. We certainly do not impute any error or abuse of discretion, but simply desire to say, that as to the existence of any such no opinion is expressed.

In our judgment, the Oyer and Terminer in discharging the writ of *habeas corpus*, and remanding the prisoner, committed no error, and that such order must be affirmed.

DANIELS, J. From the return which the respondent made to the *habeas corpus* it was made to appear that the relator was in his custody as warden of the penitentiary upon a final conviction in the Court of Oyer and Terminer of the county of New York for various misdemeanors. This appeared by the commitment itself, a copy of which was included in the return, and the direct statement of the fact in terms in such return. The commitment was in form and substance as the statute required it should be in order to justify the imprisonment and detention of the relator. The provision made upon this subject is, that "whenever a sentence of imprisonment in a county jail shall be pronounced upon any person convicted of any offense, the clerk of the court shall, as soon as may be, make out and deliver to the sheriff of the county a transcript of the entry of such conviction in the minutes of the court, and of the sentence thereupon, duly certified by such clerk, which shall be a sufficient authority to such sheriff to execute such sentence, and he shall execute the same accordingly." 2 R. S. 739, § 11.

The conviction and sentence of the relator was entered and certified as this section required that it should be. That very clearly appeared from the copies certified by the clerk of the court returned to the writ of *habeas corpus*, and produced by the warden of the penitentiary on the hearing.

The sentence as well as the commitment of the relator were for imprisonment in the penitentiary. But that did not render the provision of this statute inapplicable to the proceeding. For the penitentiary mentioned was the county jail or county prison, which is substantially the same thing for the detention and punishment of persons convicted in the county of New York of offenses not punishable by imprisonment in the State prison, and not specially rendered punishable elsewhere. This is rendered very clear by the provision made upon the subject by chapter 176 of the Laws of 1814. The preamble to that act recited that it was represented by the mayor, aldermen, and commonalty of the city of New York; that they were erecting and had nearly completed a building designed to be used as a jail for the confinement of such offenders as were to be kept at labor during their imprisonment, and requested that

it should be established as one of the jails of the city, and that the provisions afterward made should be enacted relative to the commitment of offenders to such prison. It was then provided that the building referred to should become one of the jails of the city by the name of the penitentiary of New York, and that it should thenceforth continue the jail of said city for the confinement and safe-keeping of all persons convicted of any crime or misdemeanor, and sentenced to confinement therein by any Court of Oyer and Terminer in such city, and that the keeper of such penitentiary should keep all persons committed to it in the same manner and under the same penalties as the sheriffs of other counties in the State ought to keep in the jails of the respective counties the criminals committed to them. Laws of 1814, chap. 176, §§ 1, 3.

These provisions still remain in force without any substantial change in their effect, and they created the penitentiary a prison for the punishment and confinement of a class of offenders convicted of offenses not punishable by imprisonment in a State prison. For that purpose it was created a jail of the city of New York, to which offenders convicted of misdemeanors not only could be but should be sent, as they otherwise would have been simply to the jail of the county. The keeper was required to receive and keep that class of offenders in the same manner as sheriffs of other counties received and kept the same description of persons. And that since the Revised Statutes went into effect has been by means and under the authority of the commitment provided for by the section already quoted.

Other acts more . recently enacted have, for certain purposes, referred to the prison still under the special charge of the sheriff of the county of New York as the county jail. But they in no way modified the provisions contained in the act of 1814 by which the penitentiary was created and designated a jail for the punishment of persons convicted of crimes. By that act it still continues to be the proper prison for persons convicted of misdemeanors in Courts of Oyer and Terminer held in the city of New York as well as the other courts mentioned in the law, and while it was denominated a city jail, the objects to which it was devoted render it in reality the city and county prison for the purposes designated in the act.

The relator was formally committed to that prison by the commitment which was issued, and from the entry made in the min-

utes of the court it appears that he was actually sentenced upon his conviction to such imprisonment. In these respects the case presented was strictly conformed to what the act of 1814 required that it should be to render the imprisonment lawful and proper.

If the statement contained in the judgment record is to be considered, no change will be produced by it which can result in any advantage to the relator. By that it appears that it was adjudged that he should be imprisoned in the county jail during the periods mentioned and declared. The signification of the terms used as descriptive of the prison must be determined by the circumstances under which they were used. The relator had been convicted of certain misdemeanors properly punishable by imprisonment in the penitentiary. And for that purpose it had been lawfully designated as the jail to which such convicts could be sent by Courts of Oyer and Terminer held in the county of New York. It must for these reasons have been understood as well as designed that by adjudging that the relator should be imprisoned in the county jail, that the jail was referred to in which that imprisonment could be properly made, and that was the penitentiary. This conclusion is very clearly indicated by the further circumstance that while the matter was still engaging the attention of the court and in process of consummation, the entry was made in its minutes, and the commitment issued expressly designating the penitentiary as the prison in which it was intended the relator was to be confined. At most, the record contained but a misdescription, which the entry in the minutes and the form of the commitment fully corrected. The law provided for his detention and punishment in the penitentiary, and that was in the end properly secured. That it may not have been done throughout in the most approved and artistic manner presents no good reason for his discharge by means of a writ of *habeas corpus.* The object of the law in this respect was attained without any substantial prejudice to the relator's rights, and while that appears to be the case, he has no proper ground of complaint arising out of the circumstance that in the record the prison he was consigned to was called the county jail instead of the penitentiary. For the offenses he had committed he could properly be imprisoned nowhere else, and that must have been the place the court designed he should go to when the county jail was mentioned, for the process immediately following the sentence expressly consigned him there, and the law required that he should be sent there.

But it is claimed in the relator's behalf that the Court of Oyer and Terminer in the county of New York had no power to try him for the offenses of which he was convicted, and his confinement in the penitentiary was for that reason unlawful. This position is supposed to be maintained by certain provisions contained in chapter 337 of the Laws of 1855. Those relied upon as being attended with that result are found in the fifth section of the act. That provides that "the court of special sessions of the peace in and for the city and county of New York shall have power to hear, determine and punish, according to law, all complaints for misdemeanors, and shall possess exclusive jurisdiction thereof, unless the said court of special sessions shall order any such complaint to be sent to the court of general sessions of the peace, and unless the accused, when arrested and brought before the committing magistrate, shall elect to have his case heard and determined by the court of general sessions of the peace in and for the city and county of New York." But this does not sustain the position taken on behalf of the relator. For it is not of all misdemeanors that exclusive jurisdiction was given to the court of special sessions, but only of complaints for misdemeanors. It was simply for offenses of this description for which complaints should be made that this exclusive jurisdiction was extended. And that included only cases commenced by complaint; a course of criminal proceeding previously well known to the laws of the State.

Before this statute was enacted, the laws had provided for making complaints in criminal cases. It was simply a formal application on oath for a warrant against a person supposed to have committed some crime. It was known to the common as well as the statutory law of the State. 2 R. S. 706, §§ 1, 2; Barb. Crim. Law (2d ed.), 514, and when used to designate a criminal proceeding, the term "complaint" had a definite legal signification. It formed the initiatory step in the institution of a criminal prosecution before a magistrate, and that is to be presumed to have been the legislative understanding of it as it was used in the enactment of the law of 1855. Nothing can be found in the act itself that is inconsistent with that conclusion. And when that is the case, legal terms made use of in the enactment of laws are presumed to have been employed in their strict legal sense. That is a well-settled rule which has long been applied by the courts to the construction of the statutes.

" When technical words occur in a statute, they are to be taken in a technical sense, unless it appears that they were intended to be applied differently from their ordinary or legal acceptation. So when legislating upon subjects relating to courts and legal process, we are to consider the legislature as speaking technically, unless from the statute itself, it appears that they made use of the terms in a more popular sense." Sedgwick on Stat. and Const. Law, 261, 263. " Words and phrases, the meaning of which in a statute has been ascertained, are, when used in a subsequent statute, to be understood in the same sense." Potter's Dwarris on Statutes, 274 and note ; *People* v. *Fleming*, 2 N. Y. 484, 489 ; *Clark* v. *City of Utica*, 18 Barb. 451.

According to this principle of construction, the complaints mentioned in the acts of 1855 must be understood to include only those made as the foundation of an application for a warrant in the mode prescribed by the Revised Statutes. And it is only of complaints of that nature that exclusive jurisdiction has been given to courts of special sessions, when they may be made for the commission of misdemeanors. This is rendered still more apparent by the provision contained in the same section giving the accused, when arrested and brought before the committing magistrate, his election to be tried in the court of general sessions. This privilege or right is as extended as the complaints mentioned in the preceding portion of the section, including all cases the special sessions has exclusive jurisdiction to try where that election may not be made. And it can, in no case, be made until the accused has been arrested, and taken before a committing magistrate. The provision in substance is, that the court of special sessions shall have exclusive jurisdiction to try all complaints for misdemeanors, on which the accused shall be arrested and brought before a committing magistrate when he does not elect to be tried in the court of general sessions. Taken together, that is the evident import of the provision made by the section. That it was not designed to divest the Court of Oyer and Terminer of its jurisdiction, by means of its grand jury upon indictments found, is further manifested by the provision contained in the fourth section of the same act, declaring that such court may, by an order to be entered in its minutes, send all indictments for any crimes afterward brought before it to the general sessions for trial. This provision was not confined to felonies, or to such offenses as the special sessions

could not try, but it was extended to all crimes in any way brought
before the Court of Oyer and Terminer.   Further evidence of the
propriety of restricting the exclusive jurisdiction of the special
sessions to cases of complaints made before committing magis-
trates is supplied by the seventh section of the same act.   For by
giving the court of general sessions, as it does, the power to remit
fines imposed by the Court of Oyer and Terminer, in cases where
imprisonment might be proper, the jurisdiction to try misde-
meanors is necessarily assumed to be in that court.   It is for such
offenses, and those only, that the Court of Oyer and Terminer can
impose fines where imprisonment may also be proper ; and they are
the cases in which the general sessions has been authorized to remit
the fine, and, in lieu of it, to impose the substitution of imprisonment.

Without impairing the power of the Court of Oyer and Terminer,
this statute confers upon the special sessions the power to try all
misdemeanors for which the offender may be arrested and taken by
warrant before a committing magistrate, providing he does not
elect to be tried in the court of general sessions.   That is the full
extent of the power given by means of it to the court of special
sessions.   It consequently left the statute defining the jurisdiction
of the Court of Oyer and Terminer in full force, and that empow-
ered that court to hear and determine all crimes and misdemeanors
triable in the county which might be presented by indictment.   2
R. S. 205, § 29.   This general authority was sufficient to include the
case of the relator, as long as it was not shown, and has not been
claimed, that he was ever proceeded against by complaint before
any magistrate for either of the offenses of which he has been con-
victed.   It may be assumed, as long as the contrary has not been
asserted, that the proceedings in this respect were regularly insti-
tuted and prosecuted by indictment in that court, and that being
the case, the court was competent to punish the relator by fine,
and also imprisonment in the penitentiary.   It had jurisdiction to
try the charges contained in the indictment, and, after the convic-
tion of the relator, to impose punishment upon him for the offense
of which he was found guilty.   It was a court of competent juris-
diction for those purposes, and the legality or propriety of its action
cannot be investigated or determined upon the writ of *habeas corpus.*

The power of the court before which that writ may be returned
is fixed and defined in this State by clear and explicit statutory
provisions, where the relator or applicant may be detained in cus-

tody by means of criminal proceedings against him, and by them it has been declared that "persons committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any execution issued upon such decree," shall not be entitled to prosecute the writ of *habeas corpus*. 2 R. S. 563, § 22. And no court or officer "shall have power to inquire into the legality or justice" of any process, judgment, decree or execution mentioned in that section by means of that writ. Id. 568, § 42. And that it shall be the duty of the court or officer forthwith to remand the applicant for the writ, if it shall appear that he is detained in custody "by virtue of the final judgment or decree of any competent court of civil or criminal jurisdiction, or of any execution issued upon such judgment or decree." Id. 567, § 40.

The only exception made by the statute is that in favor of persons in custody by virtue of civil process. 2 R. S. 568, § 41. And that has no application to the case made in favor of the relator, for he is in custody under final criminal process issued by a court of competent jurisdiction. According to these very plain provisions of the statute relating to the writ of *habeas corpus*, the court had no power, on its return, to make any examination or investigation into the legality of the relator's imprisonment as long as it appeared from the return that it was under the final judgment, and by virtue of process issued to execute it of a court of competent criminal jurisdiction. That was the end of the inquiry which could be lawfully instituted. And as soon as the fact was ascertained, it was the imperative duty of the court to re-commit the relator as it did.

The statute is so guarded upon this subject that the writ of *habeas corpus* cannot be procured without an oath ; that the relator is not committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or of any execution issued upon the same. Id. 564, § 25. And that oath was taken by the relator in his application for the writ which was issued. Great care was observed in imposing such restrictions upon the writ as would prevent it from being made use of as a means of reviewing the final judgments of courts of competent civil and criminal jurisdiction, or of the process authorized to and issued to carry such judgments into effect. The statute is very clear in this respect, and it has been so construed and applied by

the courts. *People* v. *Cavanagh,* 2 Park. 650 ; *People* v. *Cassels,* 5 Hill, 164 ; *People* v. *Fancher,* 4 N. Y. Sup. 467.

It is the only safe and consistent rule that can be maintained. If it were otherwise, final judgments of all courts could be reviewed and rendered nugatory by every officer having the power to allow a writ of *habeas corpus.* Another proceeding for that purpose has been provided in both civil and criminal cases by which errors and excesses of jurisdiction can be examined and corrected without endangering the stability and security of the final determinations of courts of justice.

It was insisted upon the argument of this cause, that the imprisonment of the relator was unlawful, because the jurisdiction of the court had been exceeded by the punishment which was imposed upon him. But on that subject, the decision of the Court of Oyer and Terminer was adverse to the relator. And even if that decision could not be maintained by authority, it cannot be either reviewed or disregarded by means of the writ of *habeas corpus.* The court had complete jurisdiction of the subject-matter of the indictment, and of the person of the relator, which included the power of deciding what was the proper measure of the punishment that should be imposed upon him. If it erred in that or in any other decision made during the course of the trial, a different mode has been provided for the correction of the error. It cannot be done by a collateral proceeding like the one now before the court. *Grignon's Lessee* v. *Astor,* 2 How. (U. S.) 319 ; *Elliott* v. *Peirsol,* 1 Pet. 328, 340.

In this respect the case differs from that of *Ex parte Lange,* 18 Wall. 163. There the jurisdiction of the court had become entirely exhausted by the sentence imposed and complied with before the second was pronounced; while here, the judgment, though divisible, was entire in its nature.

The case of the relator is in the same condition under the counts of the indictment on which it was claimed that he could not be imprisoned. The facts were all before the Court of Oyer and Terminer, and upon them it decided his imprisonment to be lawful. It was the judgment of a competent court upon the subject. And that was conclusive under the express provisions of the statute upon the hearing of the writ of *habeas corpus.*

The writ was properly dismissed, and the order made should be affirmed.

*Order affirmed.*